## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

DEWAYNE HERNDON
KNIGHTEN,

          Plaintiff,

v.

AARON RAMSEY, Deputy, Tulsa
County Sheriff's Office,

          Defendant.

Case No. 21-CV-0186-SEH-JFJ

## OPINION AND ORDER

This civil rights action is before the Court on two motions: Defendant
Aaron Ramsey's Motion for Summary Judgment [ECF No. 101]; and Plaintiff
Dewayne Herndon Knighten's Motion for Sanctions Due to Defendant's
Spoliation of Evidence [ECF No. 96]. Knighten seeks relief under 42 U.S.C. §
1983, claiming that Ramsey, a deputy employed by the Tulsa County Sheriff's
Office ("TCSO"), violated Knighten's Fourteenth Amendment right to be free
from the use of excessive force while Knighten was detained at the David L.
Moss Criminal Justice Center in Tulsa, Oklahoma ("the Jail"). ECF No. 1.
Ramsey moves for summary judgment, asserting he is entitled to qualified
immunity. ECF No. 101. Knighten responded in opposition to the Motion for
Summary Judgment, and Ramsey replied. ECF Nos. 108, 114. Knighten
moves for sanctions based on Ramsey's alleged failure to preserve
electronically stored information, specifically, a surveillance video that

Knighten describes as "critical" to his excessive force claim.  ECF No. 96.

Ramsey responded in opposition to the Motion for Sanctions, and Knighten

replied.  ECF Nos. 97, 100.  For the reasons discussed below, the Court finds

and concludes that Ramsey is entitled to qualified immunity.  The Court

therefore GRANTS Ramsey's Motion for Summary Judgment and

DECLARES MOOT Knighten's Motion for Sanctions.

## I. Background

The following facts are either undisputed or viewed in the light most

favorable to Knighten.[1]  In January 2020, Ramsey was a deputy for the

TCSO and worked as a correctional officer at the Jail.  ECF No. 101-2 at 2-3

(Ramsey Depo.).[2]  On January 19, 2020, Tulsa Police officers arrested

Knighten, and he was booked into the Jail around 6:00 a.m.  ECF No. 101-3

at 2-3 (Arrest & Booking Report).  When he arrived at the Jail, Knighten was

---

[1] As further discussed below, when a defendant seeks summary judgment based on qualified immunity, the Court generally adopts the plaintiff's version of the facts for purposes of the qualified immunity analysis. *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009).  But the Court need not adopt the plaintiff's version of the facts if that version lacks record support or if it is "blatantly contradicted by the record."  *Id.*  Further, as needed to flesh out the background facts, the Court exercises its discretion to consider some materials in the record that are not cited by the parties. Fed. R. Civ. P. 56(c)(3).

[2] For consistency, and unless otherwise indicated, the Court's citations refer to the CM/ECF pagination.

wearing a Controlled Ankle Movement Walker ("CAM boot") on his left foot and was using a cane.  ECF No. 101 at 10, ¶ 4; ECF No. 108 at 8, ¶ 4. Knighten was upset that jail staff took away his cane and CAM boot during the booking process.  ECF No. 101 at 10, ¶ 7; ECF No. 108 at 8, ¶ 7. Knighten believed that both of his ankles were broken and that he needed a wheelchair, but the intake nurse employed by the Jail's onsite medical provider, Turn Key Health ("Turn Key"), disagreed.  ECF No. 101-6 at 4-6 (Knighten Depo.).

A Turn Key nurse evaluated Knighten in the medical unit a few hours after he was booked into the Jail.  ECF No. 23-1 at 194-95 (TCSO Special Report).  The nurse noted that Knighten had difficulty bearing his own weight, that he had been run over by a truck two days or two weeks before his arrest, and that he reported bilateral ankle pain and back pain.  ECF No. 23-1 at 196-97, 202-03; *see also* ECF No. 101-6 at 8 (Knighten Depo.).[3]  The nurse further noted that Knighten was provided with a wheelchair until Turn Key could determine the extent of his ankle injuries.  ECF No. 23-1 at 203.

---

[3] The parties disagree as to whether Knighten's ankle injuries were obvious during the booking process.  ECF No. 101 at 10, ¶¶ 5-7; ECF No. 108 at 8, ¶¶ 4-7.  Regardless of what the booking videos show, it is clear from the Jail's medical records that Knighten was injured when he was arrested and booked into the Jail and that Turn Key staff assessed his injuries a few hours later, provided him a wheelchair, and scheduled him an appointment to have x-rays taken on January 20, 2020.  ECF No. 23-1 at 196-97, 202-03.

Turn Key staff took x-rays of Knighten's ankles on January 20, 2020, and documented the results as "abnormal" and as showing "bilateral broken ankles." *Id.* at 204.

On January 21, 2020, two days after his arrest, a Turn Key nurse referred Knighten to Hillcrest Medical Center ("Hillcrest") for further evaluation of suspected or diagnosed injuries described as "bilat[eral] fractured ankles, possible kidney injury, [and] possible hand fracture." ECF No. 101-5 at 2 (Turn Key referral form); ECF No. 23-1 at 206. [4]

Ramsey's supervisor directed him to transport Knighten from the medical unit to Hillcrest on January 21, 2020. ECF No. 101-2 at 8-10 (Ramsey Depo.). When Ramsey arrived in the medical unit that afternoon, Ramsey saw that Knighten was seated in a wheelchair with no foot rests and "in a black box." *Id.* Knighten states that he was "black boxed and handcuffed" and was wearing an orange jumpsuit that covered his legs, but his feet were

---

[4] Knighten alleged in the Complaint, stated in a subsequently submitted declaration, and stated in his deposition that after he was booked into the Jail, he was "refused medical attention" until February 7, 2020, when he was taken to the medical unit for x-rays and sent to the hospital. ECF No. 1 at 4-5 (Compl.); ECF No. 28 at 2 (Knighten Decl.); ECF No. 101-6 at 4-11 (Knighten Depo.). Knighten's statements that he was not provided medical attention at the Jail or taken to the hospital until February 7, 2020, are blatantly contradicted by the Jail's medical records, so the Court refers to the treatment dates as stated in the medical records. ECF No. 23-1 at 194-206.

visible because his "ankles were too swollen" to wear socks, sandals, or ankle restraints.[5]  ECF No. 108-6 at 7 (Knighten Depo.).  The Turn Key nurses did not give Knighten a CAM boot to wear to the hospital.  *Id.*

A nurse gave Ramsey paperwork that included a copy of the Turn Key referral form that described Knighten's suspected or diagnosed injuries as "bilat[eral] fractured ankles, possible kidney injury, [and] possible hand fracture."  ECF No. 101-2 at 11-12, 24 (Ramsey Depo.).  Ramsey did not read the form, but he knew from speaking to someone in the medical unit, either a nurse or a detention officer, that Knighten "had gotten some X-rays that they wanted of his ankles, and the nurses wanted him to go to the hospital and get more X-rays."  *Id.*

---

[5] A black box is a handcuff cover that prevents an offender from tampering with the key hole on the handcuffs.  ECF No. 97 at 8 n.1.  The black box is placed over the lock apparatus that runs between the prisoner's handcuffs and is situated between the hands.  *Id.*  A chain runs through the box, encircles the offender's waist, is tightened and then locked so that the offender's hands, restrained by cuffs and the black box, are pulled against the offender's stomach.  *Id.*  In some instances, the black box is worn in conjunction with leg irons.  *Id.*  According to Knighten, medical staff told the detention officer who handcuffed him not to cuff his injured ankles.  ECF No. 108-6 at 9 (Knighten Depo.).  It is not clear from Knighten's statements that Ramsey was the detention officer who placed him in cuffs, and Ramsey's statements suggest another detention officer was in the medical unit when he arrived and that Knighten was already handcuffed when Ramsey arrived in the medical unit.  *Id.*; ECF No. 101-2 at 10-11 (Ramsey Depo.).

Ramsey pushed Knighten's wheelchair from the medical unit to the Jail's secured parking garage, where Ramsey's transport vehicle was parked.  ECF No. 101-2 at 11-16 (Ramsey Depo.); ECF No. 108-6 at 7 (Knighten Depo.).  On the way to the parking garage, Knighten verbally expressed his displeasure with Tulsa police officers for arresting him when he had "broken ankles," and his displeasure with Turn Key medical staff for not timely treating his injuries.  ECF No. 101-2 at 13-14; ECF No. 108-6 at 7; ECF No. 108-7 at 3-5 (Tr. Knighten Interview).[6]  When Ramsey and Knighten reached the parking garage, they encountered a curb on the sidewalk.  ECF No. 101-2 at 16-17; ECF No. 108-6 at 7.  Ramsey and Knighten provide differing accounts of what happened next.

Ramsey states that, based on his previous experience in transporting prisoners via wheelchair from the parking garage into the Jail, he asked Knighten to stand up so that Ramsey "could wheel the wheelchair down" the curb, have Knighten sit back down, and then continue pushing the wheelchair to the transport vehicle, but Knighten refused.  ECF No. 101-2 at

---

[6] The Tulsa County Internal Affairs Office interviewed Knighten on November 9, 2020, and both parties submitted a transcript of that audiotaped interview.  ECF Nos. 101-8, 108-7.

16 (Ramsey Depo.); ECF No. 101-9 at 2 (Ramsey Decl.).[7]  After "a discussion," Ramsey determined he would have to push the wheelchair off the curb with Knighten sitting in the wheelchair.  ECF No. 101-2 at 16.  When Ramsey pushed the wheelchair forward to get the front wheels down the curb, Knighten "leaned forward and slammed his feet on the ground and pushed back against [Ramsey] and started yelling for help."  *Id.* at 16-18.  At that point, the back wheels were still on the curb, and Ramsey "was trying to get the wheelchair . . . back level and push" the back wheels down the curb.  *Id.* According to Ramsey, Knighten never came out of the seat of the wheelchair.  *Id.* at 18, 25.

Knighten states that Ramsey grew tired of Knighten's complaints about his arrest, "stopped right there on the curb, right in front of the curb, and told [Knighten] to get up and walk to his car since [Knighten is] such a badass." ECF No. 108-6 at 7-8 (Knighten Depo.).  Knighten refused to stand up "[b]ecause [he] had broken legs" and told Ramsey that he "could not walk"

---

[7] Ramsey submitted a declaration explaining that that he lacked training in how to transport prisoners in wheelchairs, that Knighten was the first prisoner he transported from the Jail to the parking garage, that he previously "had only transported [prisoners] from a transport vehicle into the sally port," and that, "[i]n those instances," when he encountered the curb, Ramsey "would ask the inmate to stand up and they would and then [Ramsey] would push the wheelchair up the curb and then the inmate would step up and then sit back in the wheelchair."  ECF No. 101-9 at 2.

with "broken ankles." *Id.* at 8; ECF No. 108-7 at 6-7 (Tr. Knighten Interview).  This made Ramsey "mad," Ramsey cursed at him again, and Ramsey "tried to force [Knighten] to walk" and "step off a curb which was five and a half, six inches tall, on broken legs and walk five and a half feet to his squad car."  ECF No. 108-6 at 8.   Knighten "[a]bsolutely would not" get out of the wheelchair.  *Id.*  Ramsey then "grabbed the wheelchair by the handles and didn't push forward to move [Knighten] with momentum toward" the curb "or turn [Knighten] around to back [him] off the curb; he actually grabbed the handles and jerked upward . . . multiple times" and was "basically trying to like jack [Knighten] out of the chair."  *Id.*  Knighten began yelling for help.  *Id.*  Knighten states that, at this point, he was "all the way out of the wheelchair," and "almost out of the wheelchair."  *Id.*  He further states that he was "hanging on by . . . two fingers"; that his "right shoulder was . . hanging on the lip of the wheelchair," and "impressioned [sic] in the seat"; that his "body was almost out of the wheelchair" and "on the parking garage floor"; and that he "was trying to keep from going all the way down to the concrete."  *Id.* at 8-9.

   Knighten's cries for help caught the attention of Deputy Daniel Gullett who was standing in the parking garage near his vehicle.  ECF No. 101-2 at 19-20 (Ramsey Depo.); ECF No. 108-6 at 8 (Knighten Depo.); ECF No. 108-8

at 2 (Gullett Depo.).  Knighten states that Ramsey "was still dumping [him] out of [the] wheelchair when" Gullett walked over to them.  ECF No. 108-6 at 9.  Gullett states that he "saw an individual in jail attire was on the ground, and Deputy Ramsey was trying to help him up."  ECF No. 108-8 at 2, 4. Gullett recalled few details about the incident, believed that Ramsey may have been transporting the individual to the hospital, and described the "individual on the ground" as "extremely rude and abrasive" and "an unpleasant individual."  *Id.* at 3.  Gullet helped Ramsey "pick [the individual] up and get him from the ground into" the transport vehicle.  *Id.*

Ramsey transported Knighten to Hillcrest and remained there until 4:00 p.m., when his shift ended.  ECF No. 101-2 at 19-22; ECF No. 101-9 at 2. Deputy Nick Mercer relieved Ramsey and eventually transported Knighten back to the Jail.  ECF No. 101-13 at 2 (Mercer Decl.).

After hours of testing at Hillcrest, Knighten believed he had been diagnosed as having "a crush injury with a fractured tibia, two broken ankles," and nerve damage that could become permanent if left untreated. ECF No. 101-6 at 23 (Knighten Depo.); ECF No. 101 at 14-15, ¶¶ 33-34; ECF No. 108 at 13, ¶¶ 33-34.  Knighten's medical records from Hillcrest show that he was diagnosed only with an injury to his left ankle—specifically, "a nondisplaced distal fibular fracture" that was "neurovascularly intact"—and

that he was provided a CAM boot with instructions to follow up with an orthopedic appointment.  ECF No. 101-11 at 2-6 (Hillcrest records).

## II. Ramsey's Motion for Summary Judgment

Ramsey asserts he is entitled to summary judgment based on qualified immunity.  ECF No. 101 at 16-18.  "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."  *Reichle v. Howards*, 566 U.S. 658, 664 (2012).  This shield "protects all but the plainly incompetent or those who knowingly violate the law."  *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (cleaned up).

### A. Legal standards

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material when it "might affect the outcome of the suit under the governing [substantive] law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In applying the summary judgment standard, a court must "view the facts in the light most favorable to the non-moving party and resolve all factual disputes and reasonable inferences in its favor." *Henderson v. Glanz*, 813 F.3d 938, 952 (10th Cir. 2015). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)). Consistent with the plain language of Rule 56(a), the movant bears the ultimate burden to show that there are no genuine issues for the jury to resolve and that the movant is entitled to judgment as a matter of law. *Thomson*, 584 F.3d at 1326 (Holmes, J., concurring).

However, as in this case, "[w]hen a defendant asserts qualified immunity at the summary judgment stage, it is the plaintiff's burden to prove (1) the defendant violated his constitutional rights; and (2) the law was clearly established at the time of the alleged violation." *Soza v. Demsich*, 13 F.4th 1094, 1099 (10th Cir. 2021). In deciding whether the plaintiff has satisfied this burden, a court ordinarily adopts the plaintiff's version of the facts, to the extent that version of facts is grounded in, and not blatantly contradicted

by, the summary judgment record.[8]  *Thomson*, 584 F.3d at 1325-26.  The court's first task then "is to determine whether [the] plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the *legal* question before the court" regarding qualified immunity.  *Id.* at 1326 (emphasis in original).  As to that question, the court has discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first," *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), "and may resolve the question by finding either requirement is not met," *Mascorro v. Billings*, 656 F.3d 1198, 1204 (10th Cir. 2011).

"It is only *after* plaintiff crosses the legal hurdle comprised of his or her two-part burden of demonstrating the violation of a constitutional right that

---

[8] As previously stated, Knighten moves for sanctions, asserting that Ramsey did not preserve a surveillance video of the parking garage incident that is "critical" to Knighten's ability to prove his claim.  ECF No. 96.  Knighten specifically asks this Court to find that Ramsey had a duty to preserve the video because he should have known Knighten intended to sue him, and that Ramsey acted in bad faith by failing to preserve the video.  *Id.*  Knighten seeks a default judgment against Ramsey or, in the alternative, "an order (i) imposing an adverse inference instruction and/or presumption against Defendant, and or (ii) barring Defendant from offering evidence or testimony regarding the events that would have been depicted on the spoliated video."  *Id.* at 2.  In addition, he seeks attorney's fees and costs incurred in investigating and litigating the motion.  *Id.*  Because the Court adopts Knighten's version of the facts for purposes of the qualified immunity analysis, the Court finds it unnecessary to rule on his Motion for Sanctions before performing this analysis.

was clearly established, that courts should be concerned with the *true* factual landscape—as opposed to the factual landscape as plaintiff would have it. *Thomson*, 584 F.3d at 1326 (emphases in original).  Then, [b]ased upon that true factual landscape, courts should determine whether defendant can carry the traditional summary judgment burden of establishing that there are no genuine issues of material fact for jury resolution and that defendant is entitled to judgment as a matter of law." *Id.*

### B. Analysis

Knighten claims Ramsey used excessive force against him by demanding that he stand up and walk on "broken ankles," forcefully pushing his wheelchair over the curb after Knighten refused to stand up, and causing Knighten to fall, either partially or completely, to the ground.  ECF No. 41 at 12, 18; ECF No. 58 at 1; ECF No. 108 at 1-2.  Because Knighten was a pretrial detainee when Ramsey allegedly used excessive force against him, the Fourteenth Amendment's due process clause governs his claim.  *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015).

As just discussed, to overcome Ramsey's assertion of qualified immunity, Knighten bears the initial burden to show both (1) that Ramsey's conduct violated the Fourteenth Amendment's due process clause, and (2) that the law, as it existed when the use-of-force incident occurred, would have

provided fair notice to a reasonable detention officer that this conduct would violate the Fourteenth Amendment. *Thomson*, 584 F.3d at 1325. "While there need not be a case exactly on point, *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), existing caselaw must have placed the constitutional issue 'beyond debate,' *White v. Pauly*, 580 U.S. 73, 79 (2017)." *Soza*, 13 F.4th at 1099. Ramsey contends he is entitled to qualified immunity because Knighten has not met his burden to show a constitutional violation or that the law was clearly established. ECF No. 101 at 19-37. Knighten contends he has made both showings. ECF No. 108 at 19-27.

A pretrial detainee can establish a Fourteenth Amendment violation by showing that "the force purposely or knowingly used against him was objectively unreasonable" because there is no subjective component to a Fourteenth Amendment excessive-force claim. *Kingsley*, 576 U.S. 396-97; *Rowell v. Bd. of Cnty. Comm'rs of Muskogee Cnty.*, 978 F.3d 1165, 1171 (10th Cir. 2020). In excessive-force cases "objective reasonableness turns on the 'facts and circumstances of each particular case.'" *Kingsley*, 576 U.S. at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Ultimately, several factors "bear on the reasonableness or unreasonableness of the force used," including, but not limited to: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any

effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* Under this objective standard, a pretrial detainee need not prove that an officer intended to inflict punishment. *Id.* at 398. "Rather, . . . a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Id.*

Knighten concedes that "Ramsey certainly had the legitimate objective of transporting [him] to the hospital for treatment of his broken ankles," but contends that Ramsey's "demand" that Knighten stand and walk on his broken ankles and his subsequent dumping of Mr. Knighten out of his wheelchair was ***not*** rationally related" to that objective. ECF No. 108 at 21-22 (emphasis in original). Knighten further contends that "the amount of force [Ramsey] used was also disproportionate to the amount of force that could be conceivably required" because "Knighten was not violent, disruptive, or actively resisting when [Ramsey] dumped [him] out of his wheelchair." *Id.* at 22-23.

In evaluating the first prong of the qualified immunity analysis, the question for this Court is whether Ramsey's use of force and the amount of

force used were objectively reasonable under the circumstances, and the Court must "make this determination from the perspective of a reasonable officer on the scene, including what [Ramsey] knew at the time, not with the 20/20 vision of hindsight." *Rowell*, 978 F.3d at 1171 (quoting *Kingsley*, 576 U.S. at 397); *see also Hernandez v. Mesa*, 582 U.S. 548, 554 (2017) ("Facts an officer learns after the incident ends—whether those facts would support granting immunity or denying it—are not relevant."); *White*, 580 U.S. at 76-77 ("Because this case concerns the defense of qualified immunity . . . the Court considers only the facts that were knowable to the defendant officers.").

Under Knighten's version of the facts, to the extent the record supports that version, the following facts were known to Ramsey when he first encountered Knighten in the medical unit:  Knighten was in a wheelchair with no foot rests, was handcuffed and black-boxed, and was not wearing ankle restraints, socks, or sandals, ECF No. 101-2 at 10-11 (Ramsey Depo.); ECF No. 108-6 at 7, 9 (Knighten Depo.); and Turn Key nurses had taken x-rays of Knighten's ankles and were sending Knighten to the hospital for more x-rays, ECF No. 101-2 at 11.  The following additional facts were known to Ramsey when he and Knighten encountered the curb in the parking garage: Knighten was upset about being arrested with "broken ankles," *id.* at 13; and

Knighten refused to stand up because he stated he could not walk on "broken ankles," ECF No. 108-6 at 8; ECF No. 108-7 at 6 (Tr. Knighten Interview).

On these facts, the Court agrees with Knighten's apparent position that it was unreasonable for Ramsey to demand that Knighten stand up, even if briefly, so that Ramsey could slide the empty wheelchair down the curb. But even if that demand was unreasonable, either in and of itself or because Ramsey used foul language to make the demand, Ramsey's forcefully worded demand was not a use of force.

The only use of force at issue in this case is the force that Ramsey used to push the wheelchair over the curb while Knighten remained seated in the wheelchair. Admittedly, several *Kingsley* factors favor Knighten because there is no evidence this case suggesting that the need for force was precipitated by a security problem, a threat to the detention officer, or an actively resisting plaintiff.[9] *Kingsley*, 576 U.S. at 398. But the remaining

---

[9] As previously discussed, there is evidence that Knighten was disagreeable and unpleasant, that he refused to stand up when Ramsey demanded that he do so, and that he put his feet down and pushed backward when Ramsey moved the wheelchair over the curb. But this is not the kind of active resistance contemplated by *Kingsley*. *See, e.g. Rowell*, 978 F.3d at 1173-74 (finding that "uncooperative and intoxicated" detainee was "not violent or actively resisting"); *Nosewicz v. Janoscko*, 754 F. App'x 725, 734 (10th Cir. 2018) (distinguishing between a mere refusal to obey a command and physical resistance).

factors—the relationship between force needed and force used, any effort to temper the use of force, and the extent of plaintiff's injury—favor Ramsey. *Id.* Ramsey tried to temper his use of force, initially, by asking Knighten to stand up. When Knighten refused, for good reason due to his ankle injuries, Knighten necessarily had to use some degree of force to move the wheelchair down the curb. As Knighten concedes, Ramsey was tasked with a legitimate penological purpose of transporting him to the hospital. And Knighten has not shown that the force Ramsey used was excessive in relation to his immediate objective of navigating the wheelchair down the curb. Even taking the most favorable view of Knighten's varied statements about the incident, the summary judgment record does not show that Ramsey applied such force to the wheelchair that he dumped Knighten out of the wheelchair and onto the ground. At most, the record shows that Knighten slid forward in the seat of the wheelchair, that the top half of his body remained in seat, and that the bottom half of his body was out of the seat and on the ground. ECF No. 108-6 at 8-9 (Knighten Depo.); ECF No. 108-8 at 2-4 (Gullett Depo.). And there is no evidence to support that Ramsey's use of force resulted in any degree of injury to Knighten. The record shows that two days before the use of force, Knighten was booked into jail with suspected bilateral ankle fractures and other injuries from being run over by his own truck and was wearing a CAM boot on his left ankle. ECF No. 23-1 at 194-97, 202-03; ECF

No. 101 at 10, ¶¶ 4-10; ECF No. 108 at 8,  ¶¶ 4-10.  The record further shows that several hours after the use of force, Knighten was extensively examined at the hospital, diagnosed with only a left ankle fracture, and provided a CAM boot to wear on his left ankle.  ECF No. 101-11 (Hillcrest records).

On balance, the Court finds that Ramsey used an objectively reasonable amount of force to move Knighten's wheelchair down the curb.  In hindsight, Ramsey's decision to navigate the curb by lifting the handles of the wheelchair up and pushing the front wheels forward and down the curb may have been ill-advised or even negligent.  Significantly, it is undisputed that Knighten had limited use of his hands because he was handcuffed and black-boxed, that Knighten was holding his legs up in a wheelchair that had no foot rests, and that Knighten had positioned his body in a way that he could see Ramsey grab the handles of the wheelchair and "jerk" or lift the handles upward as he pushed the front wheels over the curb.  ECF No. 101 at 11, 13-14, ¶¶ 14, 28; ECF No. 108 at 9, 12, ¶¶ 14, 28.  These factors undoubtedly contributed to Knighten's perception that he was being dumped from the wheelchair.  But hindsight serves no role in assessing the objective-reasonableness of Ramsey's use of force.  *Rowell*, 978 F.3d at 1171.  And even in the Fourteenth Amendment excessive-force context, "negligence is an insufficient basis for a § 1983 claim."  *Brashear v. Bd. of Cnty. Comm'rs of*

*Okla. Cnty.*, 402 F. Supp. 3d 1279, 1286 (W.D. Okla. 2019); *cf. Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (stating in context of Eighth Amendment excessive-force context that not "every malevolent touch by a prison guard gives rise to a federal cause of action").

Because Ramsey's use of force to move Knighten's wheelchair down the curb was objectively reasonable under the facts and circumstances of this case, he did not commit a constitutional violation. He is therefore entitled to qualified immunity. *See Mascorro*, 656 F.3d at 1204 (clarifying that court may resolve two-part qualified immunity analysis by finding by finding "either requirement is not met").

## III. Conclusion

Because Knighten failed to meet his burden to demonstrate that Ramsey's conduct in this case violated his Fourteenth Amendment right to be free from the use of excessive force, Ramsey is entitled to qualified immunity. The Court therefore GRANTS Ramsey's Motion for Summary Judgment and DECLARES MOOT Knighten's Motion for Sanctions Due to Defendant's Spoliation of Evidence.

**IT IS THEREFORE ORDERED** that the Motion for Summary Judgment [ECF No. 101] is GRANTED; and that the Motion for Sanctions

Due to Defendant's Spoliation of Evidence [ECF No. 96] is DECLARED MOOT.

**IT IS FURTHER ORDERED** that a separate judgment shall be entered herewith, and this case shall be terminated.

**IT IS SO ORDERED** this 16th day of March, 2025.

Sara E. Hill
UNITED STATES DISTRICT JUDGE